IN THE UNITED STATES COURT OF FEDERAL CLAIMS

———————

No. 26-cv-215 T
(Judge David A. Tapp)

———————

WESTERN DIGITAL CORPORATION & SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

———————

**RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

———————

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General
Tax Litigation Branch

CHRISTOPHER WILLIAMSON
Assistant Director

ALEX SCHULMAN
Trial Attorney
United States Department of Justice
Civil Division
Tax Litigation Branch
Post Office Box 26 (Ben Franklin Station)
Washington, D.C. 20044
Tel: 202-514-0456
Fax: 202-514-9440
Alexander.Schulman@usdoj.gov

i

**TABLE OF CONTENTS**

**Content(s)**                                                                               **Page(s)**

I. Factual and Legal Background ………………………………………………………..2

    a. WDC's Underpayment and the Interest Owed Thereon ............................................. 2

    b. Underpayment Interest ...................................................................................... 2

    c. Section 7508A and the Pandemic ………………………………………………….3

        1. Section 7508A prior to 2019 …………………………………………...…… 3

        2. Section 7508A since 2019 ……………………………………………………... 5

II. Questions Presented ………………………………………………….......................... 7

III. Argument ………………………………………………………………………….. 7

    a. Because WDC's Deadline Preceded the Pandemic Disaster Declaration, Section 7508A Does Not Apply and WDC's Interest Accrual Was Not Suspended ................. 7

        1. The plain meaning of the relevant statutory text limits suspension of interest accrual to interest on tax obligations coming due during disaster periods ……... 8

        2. Congress enacted § 7508A(d) knowing that IRS regulations interpreted § 7508A as affecting only deadlines falling within the postponement period and interest arising from those deadlines …………………………………………………… 10

    b. If § 7508A Had Been Applicable to WDC's Interest, It Would Have Suspended Accrual for 60 days, Not for Over Three Years ......................................................... 14

        1. The mandatory-extension period for a disaster declaration specifying only one date is 60 days from that date …………………………………………………….. 14

        2. The 2021 amendment does not validate WDC's interpretation ………………... 19

        3. Alternatively, the maximum mandatory-extension period was one year ………. 22

        4. If the Court finds *Kwong* relevant the Court should consider staying this case pending its appeal ……………………………………………………………… 24

III. Conclusion ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Case(s)**             **Page(s)**

*Abdo v. Comm'r*,
    162 T.C. 148 (2024) ............................................................................. 12, 23

*Babcock v. Kijakazi*,
    595 U.S. 77 (2022) ...................................................................................... 23

*Bufkin v. Collins*,
    604 U.S. 369 (2025) ............................................................................... 21, 22

*Freeman v. Quicken Loans, Inc.*,
    566 U.S. 624 (2012) .................................................................................... 24

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) …………………………………………………….. 19

*King v. Burwell*,
    576 U.S. 473, (2015) .................................................................................. 24

*Kwong v. United States,*
    179 Fed. Cl. 382 (2025) ................................................................... *passism*

*Monsalvo Velazquez v. Bondi*,
    604 U.S. 712  (2025) …………....……………………………………….. 11

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) .................................................................................... 23

*Thor Power Tool Co. v. Comm'r*,
    439 U.S. 522 (1979) .................................................................................... 18

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1988) .................................................................................... 23

*United States v. Brockamp*,
    519 U.S. 347 (1997) .................................................................................... 18

*Vernon v. Cassadaga Valley Cent. School Dist.*,
    49 F.3d 886 (2d Cir. 1995) …………………………………………………. 20

**Federal Statutes**             **Page(s)**

26 U.S.C. § 6072 …………………………………………………………….… 2

26 U.S.C. § 6151 …………………………………………………………………… 2

26 U.S.C. § 6532 …………………………………………………………………… 6

26 U.S.C. § 6601 ……………………………………………………………… 2, 3, 9

26 U.S.C. § 6622 ……………………………………………………………..………. 2

26 U.S.C. § 7508 ………………………………………………………………… *passim*

26 U.S.C. § 7508A ……………………………………………………………… *passim*

38 U.S.C. § 5107 …………………………………………………………………... 21

38 U.S.C. § 7261 ……………………………………………………………… 21, 22

42 U.S.C. § 5174 …………………………………………………………….... 13, 16

42 U.S.C. § 5177 …………………………………………………………….... 13, 16

Further Consolidated Appropriations Act for 2020, Public Law 116-94,
    133 Stat 2534 (December 20, 2019) ................................................................ 5

Infrastructure Investment and Jobs Act, Public Law 117-58,
    135 Stat. 429 (November 15, 2021) .................................................... 6

Taxpayer Relief Act of 1997, Public Law 105–34, 111 Stat. 788, 877,
    (August 5, 1997) ................................................................................ 3

**Regulations**                                                   **Page(s)**

26 C.F.R. § 301.7508A-1 ...................................................................... 4, 5, 6, 10

26 C.F.R. § 46.108 …………………………………………………………..…2

44 C.F.R. § 206.32 ............................................................................. 13, 18

**Other Authorities**                                      **Page(s)**

54 FR 12571 (March 23, 1989) …………………………………………………… 17

65 FR 78409 (December 15, 2000) ……………………………………………… 4, 5

70 FR 53803 (September 12, 2005) …………………………………..… 16

88 FR 8884 (February 10, 2023) …………………………………………...… 18

H.R. REP. 116-379 (Jan. 21, 2020) ...................................................................... 5, 18

Internal Revenue Manual, 4.23.9.9, 2007 WL 10142258 ……………….…………………… 10

Internal Revenue Manual, 5.5.8.20, 2007 WL 9771978 …………….….…………………. 10

Internal Revenue Manual, 25.15.9.6.2, 2007 WL 9848429 …………………………….….. 10

IRS Notice 97-62, 1997 WL 728088 ……………………………………………………… 10, 11

IRS Notice 2001-30, 2001 WL 259244 ………………………………………………….... 11

IRS Notice 2008-100, 2008 WL 4060021 ………………………………………………….. 11

IRS Notice 2008-107, 2008 WL 4253626 …………………………………………….…..… 11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

No. 26-cv-215 T
(Judge David A. Tapp)

_____

WESTERN DIGITAL CORPORATION & SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

_____

**RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

_____

Defendant, the United States, through its attorneys, files this response opposing plaintiff Western Digital Corporation & Subsidiaries' ("WDC") motion for summary judgment. WDC claims that the federal state of emergency declared during the COVID-19 pandemic suspended interest accrual on underpayment from its 2008 tax year under a then-operative provision of § 7508A.[1] Dkt. 11 at 6-7. WDC is wrong, because the deadline that precipitated the accumulation of owed interest long predated the pandemic. WDC's interest is therefore entirely outside the scope of that relief statute.

Alternatively, even if the court finds WDC is correct that § 7508A could apply to its interest accrual, WDC is wrong that the statute's mandatory postponement stretched across the entire three-plus years of the COVID-19 disaster declaration. The court should therefore, in this alternative scenario, either reject WDC's reading of the statute or stay the case pending resolution of this issue by the Federal Circuit in *Kwong v. United States*, Fed. Cir. No. 26-1843.

_____

[1] Unless otherwise noted, all references are to Title 26 of the United States Code.

## I. Factual and Legal Background

### a. WDC's underpayment and the interest owed thereon

WDC was at the relevant time a fiscal-year taxpayer whose tax year ran through June. The IRS audited multiple WDC tax years and determined deficiencies for 2008 through 2012, which WDC contested in Tax Court. The deficiency notice for 2008 was sent to WDC on June 28, 2018. On March 2, 2023, the Tax Court entered a stipulated decision establishing a $53,635,842 deficiency plus interest for 2008. Dkt. 11-1 at 6-7. On July 3, 2023, the IRS issued a notice to WDC that WDC owed $106,598,473.76 for 2008, an amount comprised of the Tax Court-stipulated deficiency plus $52,962,631.76 in underpayment interest that accrued from September 16, 2008, through July 3, 2023. On August 9, 2023, WDC paid the tax and interest in full. On July 21, 2025, the IRS received a Form 843 – Claim for Refund and Request for Abatement from WDC that claimed a refund of $20,764,747 plus overpayment interest. Dkt. 1-2 at 2-3. The IRS has at this point made no determination on that refund claim.

### b. Underpayment interest

Under § 6072(a) the due date for WDC's 2008 return was September 15, 2008. Under § 6151(a), WDC's payment was due on the same date. Interest owed to the IRS compounds daily based on the short-term federal rate. *See* § 6622; 26 C.F.R. § 46.108.

Section 6601(a) states the "[g]eneral rule" for underpayment interest: "If any amount of tax imposed by this title … is not paid on or before the last date prescribed for payment, interest on such amount at the underpayment rate … shall be paid for the period from such last date to the date paid." Underpayment interest "shall be paid upon notice and demand, and shall be assessed, collected, and paid in the same manner as taxes." *Id.* (e)(1). Interest accrual under this rule "begins on the date on which the return of the tax with respect to which such addition to tax

is imposed is required to be filed (including any extensions), and [ ] ends on the date of payment." *Id.* (e)(2)(B). It "may be assessed and collected at any time during the period within which the tax to which such interest relates may be collected." *Id.* (g). So, although WDC's 2008 tax liability was not finally settled until the Tax Court case ended in 2023, per the above statutory scheme the very latest date on which an amount of underpayment interest began to accrue was September 16, 2008.

### c. Section 7508A and the pandemic

#### 1. *Section 7508A prior to 2019*

Section 7508A was added to the Internal Revenue Code by the Taxpayer Relief Act of 1997. PL 105–34, § 911, 111 Stat. 788, 877 (August 5, 1997). Since its amendment in 2002 by the Victims of Terrorism Tax Relief Act, PL 107–134, § 112, 115 Stat. 2427, 2433-4 (January 23, 2002), subsection (a) of § 7508A has had the same language it has now:

> In the case of a taxpayer determined by the Secretary to be affected by a Presidentially declared disaster … or a terroristic or military action … the Secretary may specify a period of up to 1 year that may be disregarded in determining, under the internal revenue laws, in respect of any tax liability of such taxpayer --
> (1) whether any of the acts described in paragraph (1) of section 7508(a) were performed within the time prescribed therefor (determined without regard to extension under any other provision of this subtitle for periods after the date (determined by the Secretary) of such disaster or action),
> (2) **the amount of any interest, penalty, additional amount, or addition to the tax for periods after such date**, and
> (3) the amount of any credit or refund.

§ 7508A(a) (emphasis added).

The cross-referenced § 7508(a) postpones tax-related deadlines for persons overseas serving in combat or combat-supporting roles. Its "paragraph (1)" lists the following acts:

> (A) Filing any return of income, estate, gift, employment, or excise tax;
> (B) Payment of any income, estate, gift, employment, or excise tax or any installment thereof or of any other liability to the United States in respect thereof;

(C) Filing a petition with the Tax Court, or filing a notice of appeal from a
decision of the Tax Court;
(D) Allowance of a credit or refund of any tax;
(E) Filing a claim for credit or refund of any tax;
(F) Bringing suit upon any such claim for credit or refund;
(G) Assessment of any tax;
(H) Giving or making any notice or demand for the payment of any tax, or with
respect to any liability to the United States in respect of any tax;
(I) Collection, by the Secretary, by levy or otherwise, of the amount of any
liability in respect of any tax;
(J) Bringing suit by the United States, or any officer on its behalf, in respect of
any liability in respect of any tax or in respect of any erroneous refund; and
(K) Any other act required or permitted under the internal revenue laws specified
by the Secretary[.]

§ 7508(a)(1).

Thus, for taxpayers affected by a Presidentially declared disaster, subsection (a) of

§ 7508A grants the IRS discretion to postpone the deadline for performing any of the foregoing

"acts" for up to one year and to disregard the period of any such postponement in determining

the amount of the taxpayer's liability for interest and penalties "for periods after the date

(determined by the [IRS]) of [the] disaster."

IRS regulations first promulgated in 2000, 65 FR 78409 (December 15, 2000), flesh out

the timing rules. Since 2009, those regulations have provided:

When an affected taxpayer is required to perform a tax-related act **by a due date
that falls within the postponement period**, the affected taxpayer is eligible for
postponement of time to perform the act until the last day of the period. The
affected taxpayer is eligible for relief from interest, penalties, additional amounts,
or additions to tax during the postponement period.

26 C.F.R. § 301.7508A-1(b)(2) (emphases added). Explanatory examples in these regulations

make clear that taxpayers are "not entitled to the suspension of interest or penalties" under

4

§ 7508A where "[t]he due date for payment of [the associated] tax preceded the postponement period." *Id.* at (f) (Examples 2 and 6).[2]

### 2. *Section 7508A since 2019*

Section 205 of the Further Consolidated Appropriations Act for 2020 added a new subsection (d) to § 7508A, titled "[m]andatory 60-day extension" and stating in relevant part: "In the case of any qualified taxpayer, the period [ ] beginning on the earliest incident date specified in the [disaster] declaration … and [ ] ending on the date which is 60 days after the latest incident date so specified, shall be disregarded in the same manner as a period specified under subsection (a)." PL 116-94, 133 Stat. 2534, 3245 (December 20, 2019). This version of subsection (d) of the statute was in effect between December 20, 2019, and November 14, 2021. The House Report explained the new provision thus: "The Committee believes that the certainty and additional time provided by an automatic extension of filing deadlines for taxpayers affected by Federally declared disasters will ease the burden of tax compliance for taxpayers dealing with the hardship of disaster recovery." H.R. REP. 116-379, 99 (Jan. 21, 2020).

In June 2021 the IRS promulgated regulations governing the amended statute. The regulations placed the following "[l]imitations" on the mandatory-extension period:

> (A) In no event will the mandatory 60–day postponement period be calculated to exceed one year. (B) In the event the Secretary determines to postpone time-sensitive acts pursuant to a declaration establishing a federally declared disaster for purposes of section 7508A that does not specify an incident date, there is no mandatory postponement period under section 7508A(d). In such cases, the only postponement period will be the period determined by the Secretary under section 7508A(a) or (b).

---

[2] The 2000 version of these regulations was to similar effect. *See* 65 FR at 78412-78413 & Examples 6-7 (stating that where there is "a postponement of tax-related deadlines under section 7508A, interest on an underpayment of income tax that arises during such period will be abated," and providing examples in which the taxpayer remained "liable for the underpayment interest for the entire period" between when the tax was due and when it was finally paid because the underpayment arose (*i.e.*, the tax was due) before the beginning of the postponement period).

26 C.F.R. § 301.7508A-1(g)(3)(ii).

In the Infrastructure Investment and Jobs Act, *see* Section 80501 of PL 117-58, 135 Stat. 429 (November 15, 2021), Congress amended the mandatory-extension subsection to describe the "disregarded" period as "beginning on the earliest incident date specified in the declaration … and ending on the date which is 60 days after the later of such earliest incident date … or the date such declaration was issued." § 7508A(d)(1).[3] The amendment would "apply to federally declared disasters declared after the date of enactment of this Act." 135 Stat. at 1335.

In *Kwong v. United States*, 179 Fed. Cl. 382 (2025), the Court of Federal Claims was confronted with a refund suit filed outside § 6532(a)(1)'s limitations period of two years from the date of IRS disallowance. 179 Fed. Cl. at 385. There, as here, the relevant disaster declaration was based on conditions due to the COVID-19 pandemic "beginning on January 20, 2020, and continuing." *Id.* at 387. The government argued that the refund suit was not made timely by the pre-2021 version of § 7508A(d)(1) because the suit was filed more than 60 days after January 20, 2020, the only "incident date specified in the declaration." § 7508A(d). But the court agreed with the taxpayer that § 7508A(d) had extended the taxpayer's deadline such that the suit was timely: "The plain meaning of [§ 7508A(d)] is that [an] automatic extension runs from the beginning of the disaster declaration, through the end of the declared disaster period, and until 60 days after the end of the declared disaster period." *Id.* at 387. And because a FEMA notice published in February 2023 stated that "[t]he incident period for all COVID-19 major disaster declarations ...

---

[3] This version was in effect between November 15, 2021, and July 23, 2025. The mandatory-postponement provision has since been further amended to change the period from 60 to 120 days and is now codified at § 7508A(e). Unless otherwise noted, all references henceforth to the statute refer to the version in effect between December 2019 and November 2021, which is the version allegedly applicable to WDC's overpayment claim.

will close effective May 11, 2023," the court concluded that the mandatory 60-day extension required by § 7508(d) lasted for more than three-and-a-half years, "from [January 20,] 2020 to July 10, 2023." *Id.* at 387, 389.

Although the court recognized "Congress may not have anticipated" the "unprecedented" multi-year nation-wide pandemic disaster when it amended the statute in 2019, the court rejected the government's argument that § 7508A(d) could not operate "in the same manner" as § 7508A(a) while mandating a longer period than the maximum one-year period that the IRS could discretionarily order under § 7508A(a). *Id.* at 387-8. The court also found "[t]he regulations … appear to misread the statute by limiting the mandatory extension time described in section 7508A(d) by the general one-year provision mentioned in section 7508A(a)," whereas "the court reads the two provisions as independent. The statute is not ambiguous, at least for purposes of the timing question." *Id.* at 389.

## II.     Questions Presented

This case requires, or could require, the Court to consider the following questions:

1.     Did the mandatory extension period described in § 7508A(d) apply to underpayment interest WDC owed for its 2008 tax year, even though the deadline triggering accrual did not happen during the pandemic disaster declaration period?

2.     If § 7508A(d) applies to WDC's case, did it suspend interest accrual between January 20, 2020, and July 10, 2023?

## III.     Argument

### a.  Because WDC's Deadline Preceded the Pandemic Disaster Declaration, Section 7508A Does Not Apply and WDC's Interest Accrual Was Not Suspended.

WDC's claim concerns a stipulated deficiency for its 2008 tax year and, as described in WDC's summary judgment motion, "underpayment interest that had accrued from September 16,

2008, through July 3, 2023." Dkt. 11 at 2; *see also* Dkt. 11-1 at 6-7. WDC thus concedes that the relevant date on which the tax became due and WDC began to owe interest thereon (*i.e.*, September 16, 2008) preceded by many years the COVID-19 postponement period under § 7508A(d). This is fatal to WDC's claim because § 7508A(d) is not a generalized tolling statute affecting any tax-related time period that happens to overlap a declared disaster. Rather, it postpones deadlines, and it only suspends interest accrual related to those postponed deadlines. It does not apply to interest that had been accruing on WDC's tax debt since 2008 just because interest continued to accrue during the pandemic disaster declared in 2020. To hold otherwise would reward WDC for failing to pay during the preceding eleven-plus years.

1. *The plain meaning of the relevant statutory text limits suspension of interest accrual to interest on tax obligations coming due during disaster periods.*

Citing § 7508(d), WDC proposes that "[j]ust as disregarding a period in determining a filing deadline requires suspending the deadline during the period disregarded … disregarding a period in determining the amount of interest requires suspending any interest accrual during the period." Dkt. 11 at 10. But nothing about the statute or its history of enactment and amendment justifies this conclusion. WDC believes the statute covers "deadline[s]" to the extent they fall during the disaster period but simultaneously covers "any" overlapping interest accrual independent of the tax deadline to which that accrual relates. WDC is wrong.

Section 7508A(d) says nothing about interest accrual. It merely says that the mandatory 60-day period "shall be disregarded in the same manner as a period specified under subsection (a)." And what can be "disregarded" in subsection (a) is the IRS's "determin[ation] … in respect of any tax liability" of (i) "whether **any of the acts** described in paragraph (1) of section 7508(a) were performed within the time prescribed therefor," (ii) "the amount of any interest, penalty, additional amount, or addition to the tax for periods after "the date (determined by the Secretary)

8

of [the] disaster" and (iii) "the amount of any credit or refund." § 7508A(a)(1)-(3) (emphasis added). The relevant enumerated WDC "act[]" is therefore the one "described" in § 7508(a)(1)(B): "[p]ayment of any income, estate, gift, employment, or excise tax or any installment thereof or of any other liability to the United States in respect thereof." And the "any other liability … in respect thereof" clause here is the only element of § 7508(a)(1) that could be construed to apply to interest accumulation.

The plain meaning of these interlocking provisions is that § 7508A(a) can suspend interest accrual only when the tax deadline triggering that accrual occurs during the extension period. That is the only reasonable way to interpret § 7508A(a)'s incorporation of what it calls the "acts described in" § 7508(a)(1). The accrual of interest is a process, not an "act."

The "act" relevant to WDC that was incorporated into § 7508A(a), and thus via § 7508A(a) into § 7508A(d), is the "[p]ayment of any income … tax." § 7508(a)(1)(B). WDC (presumably) could not argue that under § 7508A an extension period that became operative as of January **2020** would have allowed or compelled the IRS to "disregard[]" whether WDC's **2008** tax return was timely filed or its **2008** taxes timely paid. Those deadlines of course remained unaffected by a disaster declared over ten years later. But WDC's 2008 tax filing and payment were the only relevant postponable "act[s]" under both § 7508A.

Since § 7508A did not extend the deadlines for those acts, it also could not suspend any of the interest that accrued as a result of WDC's failure to meet those deadlines. And under § 6601, WDC's obligation to pay interest was incurred contemporaneously with that failure. So, to the extent interest-payment can be said to be an act with a deadline, that deadline was payment of all interest in full by September 16, 2008. Everything after that is irrelevant, at least for the purpose of construing the scope of § 7508A.

2. *Congress enacted § 7508A(d) knowing that IRS regulations interpreted § 7508A as affecting only deadlines falling within the postponement period and interest arising from those deadlines.*

The heading of § 7508A tells us what the statute concerns: "Authority to postpone [ ] deadlines." When Congress first enacted the statute, it generally excluded the determination of interest from the statute's reach but noted that interest should be abated if related to a discretionary IRS postponement of "the time for filing income tax returns [and] for paying income tax with respect to such returns … for any individual located in a Presidentially declared disaster area." 111 Stat. at 879. When Congress revised the statute to include interest it did not invert but rather further codified this specification: interest was included in the discretionary remit of § 7508A(a) only where related to an "act[ to be] performed," i.e. an act whose deadline fell, during the postponement period. § 7508A(a)(1).

The current regulatory language about this issue dates from 2009 and confirms that "[w]hen an affected taxpayer is required to perform a tax-related act **by a due date that falls within the postponement period**, the affected taxpayer is eligible for postponement of time to perform the act until the last day of the period." 26 C.F.R. § 301.7508A-1(b)(2) (emphasis added). Similarly, a 2016 Internal Revenue Manual (I.R.M.) guideline discussing interest suspension says it applies to "returns having an original return due date that falls within the disaster period." I.R.M. 25.15.9.6.2, 2007 WL 9848429, at *3; *see also* I.R.M. 5.5.8.20(1), 2007 WL 9771978, at *1 (May 2019 entry specifying 7508A(a)'s authority limited to where "the original or extended due date falls within the disaster relief period"); I.R.M. 4.23.9.9, 2007 WL 10142258, at * 1 (2008 entry referring to "deadline extensions"). And the IRS's discretionary declarations under §7508A(a) had operated this way since the statute's enactment. *See, e.g.,* IRS Notice 97-62, 1997 WL 728088 ("Interest … will be abated (and waived) through January 13,

1998 with respect to federal individual income tax returns originally due on or after April 15, 1997 for individuals … located in [the disaster-declared] counties"); IRS Notice 2001-30, 2001 WL 259244 (same); IRS Notice 2008-107, 2008 WL 4253626 ("[I]nterest will be abated only for taxpayers who have an original or extended filing, payment or deposit due date, including an extended filing or payment due date, from Sept. 7, 2008, to Jan. 5, 2009 [Hurricane Ike disaster declaration period]"); Notice 2008-100, 2008 WL 4060021 (same for Hurricane Gustav).

When Congress amended § 7508A in 2019 to include a mandatory relief period in subsection (d), it directed that the mandatory relief was to work "in the same manner as … under subsection (a)." § 7508A(d). Congress thus explicitly attached § 7508A(d) to the existing framework and practice of discretionary IRS relief, including as it applied to interest accrual. It is a well-recognized canon of statutory construction that "[w]hen Congress adopts a new law against the backdrop of a longstanding administrative construction," the Court "generally presumes the new provision should be understood to work in harmony with what has come before." *Monsalvo Velazquez v. Bondi*, 604 U.S. 712, 725 (2025) (quotation marks and citations omitted). Congress legislated in 2019 against a backdrop of the IRS implementing § 7508A by— and per Congress's original instructions at enactment—only suspending interest accrual if related to a payment deadline falling during the disaster-declaration period.

WDC argues that "[t]o 'disregard' a period in determining the amount of interest necessarily means that interest does not accrue during that period. There is no other plausible way to give effect to the statutory command to disregard a disaster period in determining the amount of interest." Dkt. 11 at 10. But the question is not what "disregard" means as to interest accrual generally. WDC ignores that the statutory structure builds from § 7508A(a)(1)'s invocation of enumerated "acts" that, but for the postponement, were to have been "performed"

11

by a relevant deadline within the postponement period. Curiously, although WDC spends part of its brief attacking a 2021 IRS regulation, not at issue here, that the Tax Court held invalid in *Abdo v. Comm'r*, 162 T.C. 148 (2024), *see* Dkt. 11 at 10-11, WDC does not even mention the regulations and agency practice on this precise issue of interest accrual—regulations and practice that long predated Congress's 2019 amendment providing for a mandatory extension period.

Section 7508A(d) did not explicitly or implicitly amend § 7508A(a), especially the clear one-year cap on any disaster-related extension; indeed, the former is supposed to work "in the same manner" as the latter. And it makes no sense that Congress would have tied § 7508A(a)(1) to deadlines falling **during** a specified postponement period but then made § 7508A(a)(2) apply to **any** interest debit no matter what tax deadline triggered it or when. Each is tied to the postponement period, or neither is—and the latter result would be absurd. Presumably WDC would not propose that a postponement in force, say, only in 2026 would allow (let alone compel) the extension of due dates for 2036's tax returns and payments. Yet WDC takes the position that the pandemic-related postponement compels the suspension of interest on a tax due since 2008—12 years prior to the pandemic.

It is not plausible that Congress used a statute meant to provide temporary relief to taxpayers facing tax-related deadlines during natural disasters to simultaneously provide a windfall to taxpayers who were already in arrears to the government (and for however long) before the disaster started. Postponing a tax deadline falling **during** an emergency should naturally prevent the government from nevertheless collecting interest based on the original deadline: if not, the government would be both providing and negating the same relief in the same statute. By contrast, suspending interest accumulation for taxpayers whose ability to file and pay the original tax was unaffected by the disaster is a windfall, or worse, a reward for

12

dilatoriness. Imagine, for example, two companies both of whom owe the IRS $1 million of interest on prior deficiencies at the turn of 2020. Company A decides to pay its debt on December 31, 2019; company B, for whatever reason, does not. Under WDC's interpretation, company B, unlike company A, is rewarded with three and a half years of interest-free use of $1 million that belongs to the public fisc. Nothing in the statute justifies such a counterintuitive and counterproductive result.[4]

Things get worse still on WDC's reading. As noted above, § 7508A(a)'s "acts" come from the list in § 7508(a)(1). That list includes government acts: assessing, collecting, noticing deficiency, bringing erroneous refund suits, allowing refunds or credits. It also includes the catch-all "[a]ny other act required or permitted under the internal revenue laws specified by the Secretary." *Id.* (a)(1)(K). So, if WDC were correct that § 7508A works generalized tolling, the statute would have the perverse effect of mandatorily punishing taxpayers for living in a disaster area, or businesses for being located in one, even in terms of repose for deadlines that could be far outside the disaster-declaration period. Taxpayers who otherwise would have had the benefit of the government's statute of limitations on, say, noticing a deficiency or filing an erroneous refund suit lapsing, would face an extension of potential liability stretching out months or even years—liability that an otherwise similarly situated taxpayer who had **not** experienced a disaster would **not** face. This was not an issue under the pre-2019, purely discretionary regime, where the

---

[4] The United States' more common-sense understanding of § 7508A's disaster relief is also consistent with FEMA's interpretation of relief availability under the Stafford Act, which specifies that "[n]o Federal assistance … shall be approved unless the damage or hardship to be alleviated resulted from the disaster-causing incident which took place during the incident period or was in anticipation of that incident." 44 C.F.R. § 206.32(f). Relatedly, FEMA's broader disaster relief regime does not allow for indefinite relief. *See, e.g.* 42 U.S.C. §§ 5177 (unemployment assistance extends "no longer than 26 weeks after the major disaster is declared"); 5174(c)(1)(B)(iii) (temporary housing not provided "after the end of the 18-month period beginning on the date of the declaration").

IRS could choose which "acts" to disregard vis-à-vis afflicted taxpayers. But unless extratextual policy considerations are brought in, § 7508A(d) becomes half-punitive.

**b. If § 7508A Had Been Applicable to WDC's Interest, It Would Have Suspended Accrual for 60 days, Not for Over Three Years.**

WDC does not just ask the court to ratify an incorrectly expansive understanding of § 7508A(d) whereby it applies to any overlapping tax-related time period, including those related to deadlines falling well outside a disaster-declaration. Even if the court agrees with WDC there, which the court should not, WDC's $20,764,747 claim requires the court to further ratify the erroneous idea that Congress, via a provision meant to mandate 60-day deadline extensions, allowed the suspension of all of WDC's tax obligations between January 20, 2020, and July 10, 2023—1,267 days. Congress did no such thing, and both WDC and the *Kwong* decision are wrong in concluding otherwise.

1. *The mandatory-extension period for a disaster declaration specifying only one date is 60 days from that date.*

Section 7508A(d) defines the "[m]andatory [ ] extension" as "beginning on the earliest incident date specified in the declaration … and [ ] ending on the date which is 60 days after the latest incident date so specified." The plain meaning of this provision is that if a disaster declaration only specifies one incident date, that date is both the "earliest" and the "latest" date for the purposes of § 7508A(d), and the extension period is that date plus 60 days. Section 7508A(d) requires neither that the earliest and latest specified dates be different dates, nor that a disaster declaration contain unique earliest and latest incident dates, and there is no reason to infer such requirements. If Congress had intended the "[m]andatory 60-day extension" to encompass the entire duration of an open-ended disaster, it could have easily said so. Instead, Congress expressly tied the duration of the mandatory relief window to the "earliest incident date

specified" and "latest incident date so specified" in the disaster declaration. § 7508A(d). That explicit instruction makes clear how to calculate the mandatory relief window where a disaster declaration specifies multiple dates, as many do, while still providing a concrete and specified end to the mandatory relief period where a disaster declaration specifies only one date, as others do instead.

WDC, relying on *Kwong*, insists that in a situation like COVID-19, where the triggering declaration only specifies a beginning date but deems the disaster "continuing," the statute must be read to mean that "the latest incident date" is whatever date is later published by FEMA to close out the disaster. *See* Dkt. 11 at 9, 12-13; *Kwong*, 179 Fed. Cl. at 388. WDC caricatures the United States' argument as being that COVID-19 was declared "a major disaster for just a single [ ] day." Dkt. 11 at 12. And the court in *Kwong* similarly reasoned that "[i]f the emergency declaration was intended to include only January 20, 2020, the declaration would not have also said, 'and continuing.'" 179 Fed. Cl. at 388.

But the question here is not the straw target of whether the pandemic disaster lasted one day or several years. Nor is the question what the declaration "intended" with respect to the disaster's duration. The question is what **Congress** intended, as manifested by the words it wrote in the statute—specifically, § 7508A(d)'s mirrored references to the "earliest incident date specified in the declaration" and "latest incident date so specified." And the answer to that question is inescapable: The meaning of the words Congress wrote, as applied to a disaster declaration that specifies only one date, is that the mandatory extension period begins on that date and ends 60 days later.

That a disaster declaration refers to a disaster beginning on a specified incident date as "continuing" is irrelevant to the application of § 7508A(d). Indeed, at the time of the COVID-19

15

declarations, the use of a single date and then stating that the disaster was "continuing" was not novel. Federal disaster declarations have often identified a particular date and then described the conditions as "continuing." For example, after Hurricane Katrina, the President declared a major disaster in Louisiana "beginning on August 29, 2005, and continuing." 70 FR 53803. As a rule, moreover, "Stafford Act declarations do not expire." *Closing the Incident Period for the Stafford Act Declaration for the COVID-19 Pandemic* at 1, Congressional Research Service. If Congress had intended the "[m]andatory 60-day extension" to encompass the entirety of a "disaster period" or "incident period" for which no ending date was specified in the disaster declaration, Congress would not have tied the extension to the "earliest incident date specified" and the "latest incident date so specified" in the declaration.

Although the declaration's use of "continuing" is irrelevant for purposes of § 7508A(d), that does not mean it is surplusage, as the *Kwong* court wrongly concluded. 179 Fed. Cl. at 383. The declaration of a "continuing" disaster is highly relevant for purposes of the Stafford Act, which not only establishes the disaster-declaration process itself, but also authorizes FEMA to provide a variety of financial and direct assistance to persons affected by a declared disaster. *See, e.g.*, 42 U.S.C. § 5174. All of these assistance programs have application deadlines, and the Stafford Act sets out guidelines for establishing the proper duration of such programs. Thus, the President's description of a disaster as "continuing" in a declaration would have significant meaning for these disaster aid and recovery programs. *See, e.g.*, 42 U.S.C. § 5177 (regarding the process for providing federal unemployment and reemployment assistance to disaster-affected individuals, including the application process and duration of the assistance program). In any event, the canon against surplusage cannot properly be applied to a non-statutory document, like

16

a disaster declaration, when the result of doing so would be inconsistent with the text of an actual statute, like § 7508A.

The statute speaks of "**the** declaration," i.e., declaration in the singular. It does not say, for example, "earliest incident date specified in the initial disaster declaration" and then "latest incident date so specified in that declaration or an amended declaration." By contrast, the mirroring of "earliest incident date **specified in the** declaration" and "latest incident date **so specified**" must be read such that "specified" refers in each case to the same, single declaration and is limited to the date or dates contained therein. If that single declaration only contains one date, then that is the only relevant date as far as "[m]andatory 60-day extension" is concerned.

This is far from "untenable," and it does not "read 'and continuing' out of the declaration" as WDC argues. Dkt. 11 at 12-13. What is untenable is *Kwong* and WDC's reading of "incident period" or "disaster period" **into the statute**. As *Kwong* itself separately noted, it is the statutory meaning that controls. *Id.* at 387 ("Although Congress may not have anticipated a disaster declaration lasting more than three years, the statute's express text nevertheless applies."). The statutory meaning of "the declaration," much less the meanings of "the earliest incident date specified [there]in" and "the latest incident date so specified," was not altered by the use of "and continuing" in a subsequent proclamation. By describing the pandemic as "continuing," the President's 2020 disaster declaration could not have and did not amend Congress's use of "the declaration" in its 2019 statute to make it say instead "the declaration [and any subsequent FEMA notice closing the 'incident period' and amending the declaration]."[5]

---

[5] The President has delegated many disaster-related functions to FEMA but not the declaration of a major disaster or emergency. *See* 54 Fed. Reg. 12571, § 1 (Executive Order 12673, issued March 23, 1989).

Section 7508A(d)'s "latest incident date so specified" cannot equal "continuing": that word is plainly not a date, much less one "specified" in the original declaration in which it appears. To be sure, FEMA regulations regard disasters in terms of an "incident period," defined as "[t]he time interval during which the disaster-causing incident occurs." 44 C.F.R. § 206.32(f).[6] But if Congress had meant § 7508A(d) to mandate postponement for the whole of any such period plus 60 days, even if the declaration itself does not specify an ending date, it could have adopted FEMA's "incident period" nomenclature. Instead, Congress chose to tie the mandatory 60-day postponement to the "incident date[s]" specified in the declaration.

Finally, the United States' interpretation is far more reasonable than one that would mandate a postponement period of 1,267 days under the same statute that limited the IRS's discretionary postponement authority to one year. *Cf. Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 542 (1979) (Tax Code must be interpreted under presumption that its "primary goal … is the equitable collection of revenue" and "to protect the public fisc."); *United States v. Brockamp*, 519 U.S. 347, 352-3 (1997). The point of the mandatory extension was that "certainty and additional time" would "ease the burden of tax compliance for taxpayers dealing with the hardship of disaster recovery." H.R. REP. 116-379, 99 (Jan. 21, 2020). The 60-day period under § 7508A(d) was a backstop allowing afflicted taxpayers to rest easy while the IRS determined whether the scope of the relevant disaster warranted the more generous relief that the IRS has discretion to provide under § 7508A(a).

---

[6] This point is further underscored by the document WDC claims closed the mandatory postponement. FEMA's "Expiration of COVID-19-Related Measures" notice issued February 10, 2023, stated "that the incident **period** for all COVID-19 major disaster declarations and the nationwide emergency declaration will close effective May 11, 2023." 88 FR 8884-01, 8884 (emphasis added).

In stark contrast to this sensible reading, the potential scope of *Kwong* and WDC's alternative reading is breathtaking and creates an absurd statutory scheme. Under their logic, Congress created a statute that not only allows for indefinite postponement of tax deadlines and indefinite suspension of interest accrual on tax debts **for all taxpayers everywhere** but also gives FEMA administrators greater power over tax administration than the IRS and the Treasury Secretary. Even if the text of the statute could be contorted to effect that result, Congress does not "hide elephants in mouseholes." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006).

2. *The 2021 amendment does not validate WDC's interpretation.*

WDC suggests that the 2021 amendment of § 7508A(d) forecloses the United States' argument. As shown above, *see supra* at 6, that amendment made the mandatory period "end[ ] on the date which is 60 days after the later of [the] earliest incident date or the date [the] declaration was issued." WDC argues the United States' construal of the 2019-2021 version makes this amendment have no effect. Dkt. 11 at 13; *see also Kwong*, 179 Fed. Cl. at 388 (the 2021 amendment "changed the statute to no longer have an indefinite automatic extension when a disaster lasts a long time," which "implies that Congress changed the statute's meaning; otherwise, Congress could have left the statute's text as it was"). But that reasoning is unpersuasive.

First, the United States' argument does not leave the amendment without effect. Even under the United States' reading of the 2019-2021 version, the 2021 amendment established a new regime whereby the mandatory extension depended on the interplay between two dates: incident date and declaration issuance date. The latter was not an element of the 2019-2021 version and does not figure in the United States' interpretation. In the 2019-2021 version of

§ 7508A(d), the mandatory extension depends solely on the "incident date[s] specified in the [disaster] declaration; the date the declaration issues is irrelevant.

Thus, the practical effect of the 2021 amendment was linking the start of the 60-day countdown period to the date of the disaster declaration rather than the date of the disaster itself. This change ensures that the 60-day postponement period under § 7508A(d) does not end before the declaration itself is issued. *Kwong*'s contrary view that the 2021 amendment was intended to prevent indefinite extensions was colored by the court's erroneous view that the pre-2021 statute permitted the "latest incident date" to be a non-specific "continuing" postponement.

There is no reason to believe, moreover, that Congress was even aware that the pre-2021 statute might be (mis)construed to provide indefinite extensions in circumstances like the COVID-19 pandemic. There had been no reported cases raising that argument when Congress amended the statute in 2021. And if Congress had been concerned about the possibility of indefinite extensions, it could have provided that the 2021 amendment applied retroactively. *See Vernon v. Cassadaga Valley Cent. School Dist.*, 49 F.3d 886, 889 (2d Cir. 1995). But it did not – Congress provided that the amendment would only apply prospectively, which supports the view Congress was not attempting to address a potential indefinite extension issue when amending the statute.

Second, even if Congress did enact the 2021 amendment to prevent indefinite extensions, it violates no canon of statutory interpretation to propose that Congress amended a statute to clarify how it already worked. Amendment may be evidence that the prior statute was ambiguous or unclear on some important point; it does not compel an interpretation whereby the prior statute meant the opposite of what the amended statute means.

Indeed, we need look no further than the case cited by WDC (and *Kwong*) to see this principle in action. *Bufkin v. Collins*, 604 U.S. 369 (2025), asked how to interpret an amendment to 38 U.S.C. § 7261, which sets out the scope and standard of review for the Court of Appeals for Veterans Claims ("CAVC"). Its subsection (a) generally empowers the CAVC to decide questions of law but set aside only "clearly erroneous" agency factfinding. *Bufkin*, 604 U.S. at 374. In 2002, Congress amended its subsection (b) to say that "[i]n making the determinations under subsection (a), the Court shall … take due account of the Secretary's application of section 5107(b) of this title." 38 U.S.C. § 7261(b)(1); *Bufkin*, 604 U.S. at 374. That provision states a "[b]enefit of the doubt" rule for veterans' benefits cases:

> The Secretary shall consider all information and lay and medical evidence of record in a case before the Secretary with respect to benefits under laws administered by the Secretary. When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant.

38 U.S.C. § 5107(b).

The question, then, was what effect adding "take due account of the Secretary's application of section 5107(b)" had on CAVC adjudication. The petitioners argued "that the statutory command to 'take due account' of the VA's application of the benefit-of-the-doubt rule requires the [CAVC] to review the entire record *de novo* and decide for itself whether the evidence is in approximate balance." *Bufkin*, 604 U.S. at 378. The Supreme Court disagreed, construing the amendment thus:

> [T]he statutory command to "take due account" of the VA's application of the benefit-of-the-doubt rule requires the [CAVC] to give appropriate attention to the VA's work [and t]he text makes clear that the appropriate attention due is that which is required under subsection (a). … This language highlights that taking due account is not a freestanding task but rather an *aspect* of judicial review under subsection (a).
> The upshot is straightforward. Review of the VA's benefit-of-the-doubt decision is just another determination made "under subsection (a)." Accordingly,

the standards of review provided in subsection (a) also govern [CAVC] review of benefit-of-the-doubt issues. In particular, subsection (a) requires the [CAVC] to review the VA's conclusions of law *de novo* and its findings of fact for clear error…

    Section 7261(b)(1) makes explicit [CAVC's] previously implicit duty to review the VA's application of the benefit-of-the-doubt rule, pursuant to the standards set forth in subsection (a). Of course, this duty predated Congress's enactment of § 7261(b)(1); subsection (a) always required [CAVC] to review all relevant findings of fact and conclusions of law. But, Congress's enactment underscores the benefit-of-the-doubt rule's status as a paramount consideration.

*Id.* at 379-80 (emphases in original) (internal citations omitted). It was **the petitioners and the dissent** in *Bufkin* who argued as WDC does here: that the above cannot be right because it renders the statute essentially unchanged and the amendment thereby toothless. *Id.* at 386; *see also id.* at 389 ("the Court today concludes that Congress meant nothing when it inserted subsection (b)(1) …") (Jackson, J., dissenting).

*Bufkin*, therefore, shows that amendment can be construed to "make explicit [something] previously implicit" or "underscore" how a statute should be seen to have been operating all along. And something very similar could be proposed about amending § 7508A(d) in 2021 so that the 60-day mandatory postponement period had to be measured from one of two dates certain. It made explicit what was implicit in the prior version: that the 60 days is a grace period granting taxpayers set certain relief while the IRS determines whether additional discretionary relief is warranted. Even if § 7508A(d) can be deemed ambiguous as to how it was to operate given a disaster declaration specifying an incident date "and continuing," that does not mean the 2021 amendment retrospectively resolves that ambiguity in favor of WDC's position.

    3.  *Alternatively, the maximum mandatory-extension period was one year.*

The other problem with WDC's and *Kwong*'s interpretation is that it negates § 7508A(d)(1)'s directive that the mandatory 60-day postponement period must "be disregarded **in the same manner** as a period specified under [section 7508A(a)]" (emphasis added), a period

limited to one year. In *Abdo v. Comm'r*, 162 T.C. 148 (2024), a case involving a regulatory provision under § 7508A(d) that is not at issue here, the Tax Court "acknowledge[d] that, in other statutory contexts, the phrase 'in the same manner' has been construed as meaning 'to use the same methodology and procedures.'" 162 T.C. at 164-5 (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 545 (2012)) (citing cases). But the Tax Court then decided that it did not have such meaning in § 7508A(d)(1) and instead signified no more than that § 7508A(a)'s reference to the "acts" in § 7508(a) was carried over to § 7508A(d). *Id.* at 165-6. *Kwong* gave "in the same manner" even shorter shrift, also concluding that it narrowly refers only to "the types of actions that can be delayed." 179 Fed. Cl. at 387-8.

Per *Abdo*, however, it is at least ambiguous what § 7508A(d)'s reference to operating "in the same manner" as § 7508A(a) means, and "in the same manner" can be given its proper substance without negating the mandatory aspect of § 7508A(d). It does not negate Congress' enactment of a mandatory period to propose that it cannot be longer than one year, whether or not the IRS provides discretionary relief. That is a common-sense way of understanding Congress' wish to implement a new mandatory-relief regime that operated "in the same manner" as the old discretionary-relief-only regime. And it makes more sense than a reading whereby the mandatory-relief period could be far longer than even the **outer limit** of the discretionary-relief period. "Statutory construction [ ] is a holistic endeavor" wherein the "permissible meanings" of terms are limited to those having a "substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988); *see also Babcock v. Kijakazi*, 595 U.S. 77, 85 (2022) (affirming importance of context in statutory construction and necessity to avoid readings "inconsistent with the choices that Congress made in the statutory scheme").

Moreover, as already shown, *see supra* at 13-14, reading § 7508A(d)'s "in the same manner" to mean simply that the same list applies in the same way to § 7508A(d) as to § 7508A(a), without any additional consideration of the overall statutory purpose, also creates absurd results given *Kwong*'s theory of § 7508A(d). As noted above, § 7508A(a)'s "acts" come from the list in § 7508(a)(1). That list includes government acts: assessing, collecting, noticing deficiency, bringing erroneous refund suits. It also includes the catch-all "[a]ny other act required or permitted under the internal revenue laws specified by the Secretary." *Id.* (a)(1)(K). If WDC and *Kwong* are right, and no extratextual considerations are brought in, then by using the phrase "in the same manner" in § 7508A(d)—an amendment obviously intended as a taxpayer-relief measure—Congress in fact inflicted mandatory punitive consequences on taxpayers with the misfortune to be located in disaster zones.

A purportedly strict textualist reading that must assume a congressional intention to punish disaster-afflicted taxpayers (and only those so afflicted) by giving the IRS extra time, whether it is months or years, to pursue assessment and collection, cannot be right. *Cf. Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 632 (2012) (rejecting interpretation that could turn statute's intended beneficiaries into its potential targets); *King v. Burwell*, 576 U.S. 473, 489-92 (2015) (rejecting interpretation that would cause opposite result of statutory purpose). "[I]n the same manner" is better interpreted as tethering § 7508A(d) more closely to § 7508A(a) and assuming a common-sense construal whereby discretionary relief was expected to be taxpayer-friendly but could not last longer than a year.

    4. *If the Court finds* Kwong *relevant the Court should consider staying this case pending its appeal.*

As argued above, *see supra* III.a, the Court can resolve this case without addressing *Kwong*'s striking judgment that by enacting § 7508A(d) Congress brought most of the federal tax

24

system to a halt for three and a half years after the start of the pandemic. However, if the Court disagrees, judicial efficiency would be served by staying this case pending the Federal Circuit's disposition of the *Kwong* appeal.

## III. Conclusion

WDC owed underpayment interest to the United States due as of September 16, 2008, and accruing thereafter. The statutory framework governing postponement of tax deadlines during federally declared disasters, §§ 7508(a) and 7508A, makes clear it is only deadlines that fall during a postponement period that matter, and that interest-accrual is therefore disregarded only to the extent it is connected to a deadline that so falls. Because this was indisputably not the case regarding WDC's tax obligations, WDC's claim should be rejected as a matter of law. Even *Kwong* does not require that the ramifications of a "continuing" COVID-19 disaster declaration be extended for decades in either direction.

Respectfully submitted,

Dated: June 8, 2026

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General
Tax Litigation Branch

CHRIS WILLIAMSON
Assistant Director

*/s/ Alex Schulman*
ALEX SCHULMAN
Trial Attorney
Tax Litigation Branch
Civil Division, Department of Justice
Post Office Box 26
Post Office Box 26 (Ben Franklin Station)
Washington, D.C. 20044
Telephone: (202) 514-0456
Alexander.Schulman@usdoj.gov