**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

WESTERN DIGITAL CORPORATION &
SUBSIDIARIES,

             Plaintiff,

    v.

UNITED STATES OF AMERICA,

             Defendant.

Case No. 26-215 T
(Judge David A. Tapp)

**PLAINTIFF'S REPLY IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Saul Mezei
Jonathan C. Bond
John F. Craig, III
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539
SMezei@gibsondunn.com
JBond@gibsondunn.com
JCraig@gibsondunn.com

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

    I.     Section 7508A(d) Suspends Accrual Of Underpayment Interest During A Presidentially Declared Disaster Period Regardless Of The Original Deadline To Pay The Tax ...................................................................................... 2

          A.     The Government's Position Disregards The Controlling Statutory Text ................................................................................................... 3

          B.     The Government's Implicit-Ratification Theory Is Implausible ................ 5

          C.     The Government's Policy Arguments Are Misdirected ............................. 7

    II.    There Is No Lawful Basis To Limit Western Digital's Refund To 60 Days Or 1 Year ........................................................................................................ 9

          A.     The Declaration's "And Continuing" Language Forecloses The Government's Attempt To Limit The Suspension Period To 60 Days ................................................................................................... 10

          B.     The Statute Does Not Limit Disaster Periods To One Year ..................... 15

          C.     This Court Should Not Stay The Case Pending A Possible Decision In *Kwong* ................................................................................. 15

CONCLUSION .................................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**                                                                                                                                 **Page(s)**

*3M Co.* v. *Commissioner*,
  154 F.4th 574 (8th Cir. 2025) ....................................................................................................6

*Bufkin* v. *Collins*,
  604 U.S. 369 (2025)..................................................................................................................15

*Cherokee Nation of Oklahoma v. United States*,
  124 F.3d 1413 (Fed. Cir. 1997)...........................................................................................16, 17

*Cyan, Inc.* v. *Beaver County Employees Retirement Fund*,
  583 U.S. 416 (2018)....................................................................................................................4

*Eaglehawk Carbon, Inc.* v. *United States*,
  122 Fed. Cl. 209 (2015) ..............................................................................................................6

*FDIC* v. *Philadelphia Gear Corp.*,
  476 U.S. 426 (1986)....................................................................................................................6

*Gitlitz* v. *Commissioner*,
  531 U.S. 206 (2001)....................................................................................................................7

*In re Google LLC*,
  2018 WL 5536478 (Fed. Cir. Oct. 29, 2018)............................................................................17

*Haig* v. *Agee*,
  453 U.S. 280 (1981)....................................................................................................................6

*Kwong* v. *United States*,
  179 Fed. Cl. 382 (2025) ............................................................................................................15

*Landis* v. *North American Co.*,
  299 U.S. 248 (1936)...............................................................................................................16, 17

*Loper Bright Enterprises* v. *Raimondo*,
  603 U.S. 369 (2024)....................................................................................................................6

*M & K Employee Solutions, LLC* v. *Trustees of IAM National Pension Fund*,
  146 S. Ct. 1224 (2026)..............................................................................................................15

*Mayronne* v. *Commissioner*,
  No. 1984-24 (T.C. Mar. 13, 2026)...........................................................................................15

*Mudge* v. *United States*,
  308 F.3d 1220 (Fed. Cir. 2002).................................................................................................17

**Cases (*continued*)**                                                                    **Page(s)**

*National Ass'n of Manufacturers* v. *Department of Defense*,
    583 U.S. 109 (2018)...............................................................................................5

*Oncale* v. *Sundowner Offshore Services, Inc.*,
    523 U.S. 75 (1998)..............................................................................................13

*Seila Law LLC* v. *CFPB*,
    591 U.S. 197 (2020)............................................................................................12

*United States ex rel. Schutte* v. *SuperValu Inc.*,
    598 U.S. 739 (2023)..............................................................................................7

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1 ...............................................................................................13

**Statutes**

Infrastructure Investment and Jobs Act,
    Pub. L. No. 117-58, 135 Stat. 429 (2021):

    § 80501, 135 Stat. 1335 ..............................................................................14

Victims of Terrorism Tax Relief Act of 2001,
    Pub. L. No. 107-134, 115 Stat. 2427:

    § 112, 115 Stat. 2433 ...................................................................................2

26 U.S.C. § 6404.................................................................................................................2

26 U.S.C. § 6601.................................................................................................................5

26 U.S.C. § 7508............................................................................................................5, 9

26 U.S.C. § 7508A.............................................................................................1, 3, 4, 5, 9

26 U.S.C. § 7508A (2019) ..............................................................................1, 3, 9, 11, 13, 14

**Regulations**

26 C.F.R. § 301.7508A-1.................................................................................................7, 13

28 C.F.R. § 0.20(b) ..........................................................................................................17

**Other Authorities**                                                                    **Page(s)**

70 Fed. Reg. 53,803 (Sept. 12, 2005) ...................................................................12

70 Fed. Reg. 70,086 (Nov. 21, 2005)....................................................................12

85 Fed. Reg. 20,703 (Apr. 14, 2020) .......................................................9, 10, 11, 13

88 Fed. Reg. 8884 (Feb. 10, 2023) ........................................................................9

*How the Pandemic is Changing the IRS*, U.S. Government Accountability Office
    (Nov. 2, 2021), https://perma.cc/7SHX-FLW3 ...........................................9

U.S. Department of Justice, *Justice Manual* (2018),
    https://perma.cc/VK7S-FPAM ...........................................................16

**INTRODUCTION**

The government's opposition confirms that summary judgment is warranted. The government does not dispute any facts, including that Western Digital was a California-based taxpayer for the entire duration of a presidentially declared disaster covering that State that began January 20, 2020, and ended May 11, 2023. The plain text of 26 U.S.C. § 7508A(d) (2019) thus requires the IRS to disregard that whole period, plus 60 days, in determining the amount of any interest owed by Western Digital—here, underpayment interest it paid on its FY 2008 federal income tax.

Instead, the government resists the refund that Section 7508A(d) mandates based on invented limitations found nowhere in the statutory text but rooted in the agency's own self-serving pronouncements. Specifically, the government argues that (1) Section 7508A(d) does not apply at all to interest on tax liabilities that arose before a federal disaster declaration, and (2) any relief under that provision is limited to 60 days or 1 year. Both contentions flout the Code and rest on atextual policy considerations and agency regulations at odds with the statutory text and structure. The Court should apply the statute as written and grant summary judgment to Western Digital.

**ARGUMENT**

Section 7508A(d) entitles Western Digital to a refund of underpayment interest it paid that accrued between January 20, 2020, and July 10, 2023. There is no merit to the government's efforts either to limit Section 7508A(d)'s application to tax deadlines that arose before the disaster period or to truncate the period to be disregarded. And the government does not even attempt to identify the sort of pressing need required to justify its fallback, conditional request for a lengthy stay of this litigation pending the Federal Circuit's eventual decision in *Kwong* v. *United States*, No. 26-1843 (Fed. Cir.).

I.    **Section 7508A(d) Suspends Accrual Of Underpayment Interest During A Presidentially Declared Disaster Period Regardless Of The Original Deadline To Pay The Tax**

Section 7508A(d)'s text straightforwardly requires suspending the accrual of interest during a disaster period.  See Mot. 9-10.  Section 7508A(d) commands that the period from the earliest incident date through 60 days after the latest incident date "shall be disregarded in the same manner" as a period specified under Section 7508A(a).  26 U.S.C. § 7508A(d) (2019).  Section 7508A(a), in turn, empowers the Secretary to "disregar[d]" a period "in determining * * * in respect of any tax liability of [a relevant] taxpayer * * * the amount of any interest."  *Id.* § 7508A(a)(2).  Congress explained when it enacted that provision that it creates "authority to suspend running of interest."  Victims of Terrorism Tax Relief Act of 2001, Pub. L. No. 107-134, § 112(a), (d), 115 Stat. 2433, 2435 (amending 26 U.S.C. § 6404(i)).  Section 7508A(d) turns that "authority" into a mandatory suspension during the period specified by subsection (d).

The government does not engage with that straightforward reading of Section 7508A's controlling text.  Instead, the government contends that Section 7508A(d) suspends the running of interest *only* on "tax obligations *coming due during* disaster periods."  Opp. 8 (emphasis added).  That contrived limitation has no legal basis.  Section 7508A says no such thing, and nothing supports the government's proffered justifications for reading that atextual limitation into the Code.  The government contends that the statutory text supports its reading, but it disregards Section 7508A's most pertinent provision.  The government also argues that Congress implicitly ratified the agency's prior regulations.  But it is implausible that, in fundamentally *altering* Section 7508A (to provide mandatory relief), Congress silently adopted the agency's interpretation of the *prior* version of the statute (which addressed only discretionary relief).  When all else fails, the government retreats to policy concerns.  But those policy concerns cannot override the statute's text, and they lack merit in any event.  The Court should give effect to the judgment Congress made.

2

**A.      The Government's Position Disregards The Controlling Statutory Text**

The government purports to ground its position that Section 7508A(d) suspends interest only on tax liabilities that first come due during a disaster in the statutory text.  But its argument fails at every step.  The government fails to grapple with the directly controlling portion of the text.  And the government's parsing of the language it selectively invokes fails on its own terms.

The government concedes, as it must, that Section 7508A(d) requires that the period that provision specifies "shall be disregarded in the same manner as a period specified under subsection (a)."  Opp. 8 (quoting 26 U.S.C. § 7508A(d)(1) (2019)).  And it admits that subsection (a) authorizes—and subsection (d) thus *requires*—disregarding the disaster period in determining the items enumerated in paragraphs (a)(1)-(a)(3).  *Ibid.*  As the government acknowledges (Opp. 8-9), those items are "(1) whether any of the acts described in paragraph (1) of section 7508(a) were performed within the time prescribed therefor," "(2) *the amount of any interest*, penalty, additional amount, or addition to the tax," and "(3) the amount of any credit or refund."   26 U.S.C. § 7508A(a)(1)-(3) (emphasis added).  Paragraph (a)(2) thus expressly permits, and so paragraph (d)(1) mandates, disregarding the disaster period in determining the amount of any interest.

Yet despite quoting all of Section 7508A(a)'s items, the government pretends that paragraph (a)(2) does not exist and argues that Western Digital's refund claim must stand or fall under paragraph (a)(1).  Its entire discussion of the statutory text (Opp. 9) addresses paragraph (a)(1), which provides for disregarding the disaster period in determining "whether any of the acts" listed in Section 7508(a)(1) were performed on time.  The government contends that the only "act" in Section 7508(a)(1) relevant to the accrual of underpayment interest is the "[p]ayment of any  *  *  * tax" and that Section 7508A(a) and (d) provide for suspending the accrual of interest "only when the tax deadline triggering that accrual occurs during the extension period."  *Ibid.*  That reasoning

3

ignores paragraph (a)(2), which speaks directly to disregarding a disaster period in determining interest.

The government mislabels those paragraphs "interlocking provisions," Opp. 9, but on the statute's face they are *independent*. Congress enumerated in Section 7508A(a)(1)-(3) three types of determinations in which it initially allowed, and later directed, the government to disregard the disaster period (and, under Section 7508A(d), an additional 60 days). That paragraphs (a)(1) and (a)(2) may sometimes overlap and produce the same result in a given case does not license reading either provision out of the statute. Each operates independently and must be given effect. And because Section 7508A(d)(1) expressly refers to "subsection (a)," not solely paragraph (a)(1), it incorporates all three categories. See *Cyan, Inc.* v. *Beaver County Employees Retirement Fund*, 583 U.S. 416, 428 (2018) ("Congress often drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down the line. And when Congress wants to refer only to a partic-ular subsection or paragraph, it says so." (brackets and internal quotation marks omitted)). That includes paragraph (a)(2), which expressly provides for disregarding the disaster period in deter-mining "the amount of any interest." 26 U.S.C. § 7508A(a)(2). The government's theory that paragraph (a)(*1*) does not suspend accrual of underpayment interest unless the tax first comes due *during* the disaster is irrelevant: Paragraph (a)(*2*) explicitly authorizes—and paragraph (d)(1) therefore requires—suspending accrual of "any interest," *ibid.*, including underpayment interest irrespective of when the tax first came due.

The government never grapples with paragraph (a)(2). It quotes that provision in passing (Opp. 8-9) but then ignores its directly controlling language. And the government's position that suspension of interest is governed solely by paragraph (a)(1) simply reads paragraph (a)(2) out of

4

the statute. No court is "free to 'rewrite the statute' to the Government's liking." *National Ass'n of Manufacturers* v. *Department of Defense*, 583 U.S. 109, 123 (2018) (citation omitted).

In any event, the government's argument fails on its own terms. The government asserts that paragraph (a)(1) suspends interest only "if related to a payment deadline falling during the disaster-declaration period." Opp. 11. But interest that accrues during a disaster period *is* related to a deadline to pay that falls during the disaster period. When a taxpayer misses the original deadline to pay a tax, he faces an *ongoing* obligation to pay every day thereafter and faces a corresponding consequence for each day he fails to do so: newly compounding interest. See 26 U.S.C. § 6601(e)(2)(B) (providing that interest "begins" to accrue on the date the tax comes due and "ends on the date of payment"); see also *id.* § 7508(a)(1)(B) (listing the payment of "any installment" among the enumerated acts). It follows that the "time prescribed" to pay overdue income tax is the next day, every day. *Id.* § 7508A(a)(1). Thus, even under the government's blinkered reading of paragraph (a)(1) in isolation, Section 7508A(a) authorizes—and Section 7508A(d) thus requires—suspending the accrual of interest during disaster periods regardless of the tax's due date.

With or without the government's impermissible editing of Section 7508A(a) and (d), the result is the same: The disaster period cannot be counted in determining the amount of any underpayment interest.

## B.    The Government's Implicit-Ratification Theory Is Implausible

Unable to ground its interpretation in the statutory text, the government argues (Opp. 10-11) that Congress, in enacting Section 7508A(d), silently incorporated the IRS's existing regulations and Internal Revenue Manual provisions implementing Section 7508A(a). That contention is not credible.

The government wisely does *not* argue that any of its regulations or the Internal Revenue Manual governs the interpretation of Section 7508A's text or is entitled to any deference. For good reason: No agency regulation can override a statute or determine the meaning of ambiguous provisions. See *Loper Bright Enterprises* v. *Raimondo*, 603 U.S. 369, 400, 413 (2024). The Court must "adopt the 'best reading of the statute': the one 'the court would have reached if no agency were involved.'" *3M Co.* v. *Commissioner*, 154 F.4th 574, 577 (8th Cir. 2025) (quoting *Loper Bright*, 603 U.S. at 400) (giving IRS regulation no deference and rejecting IRS's interpretation de novo). A fortiori, the Internal Revenue Manual adds nothing to the statutory analysis; it binds no one, not even the government. See *Eaglehawk Carbon, Inc.* v. *United States*, 122 Fed. Cl. 209, 221 (2015).

The government instead tries to bring its regulation and the Internal Revenue Manual in through the back door, arguing that Congress implicitly ratified the interpretation of Section 7508A embodied in the regulation and Internal Revenue Manual when it enacted subsection (d) in 2019. That assertion is implausible.

Courts infer that Congress ratified an agency interpretation only "[w]hen the statute giving rise to the longstanding interpretation has been reenacted without pertinent change," *FDIC* v. *Philadelphia Gear Corp.*, 476 U.S. 426, 437 (1986), and when "[t]here is no evidence of any intent to repudiate the longstanding administrative construction," *Haig* v. *Agee*, 453 U.S. 280, 297 (1981). That is not the case here. The statutory amendment that added subsection (d) did not preserve Section 7508A unaltered. It *transformed* Section 7508A, from establishing only a discretionary deferral period to imposing a mandatory suspension for the entire duration of a presidentially declared disaster (plus 60 days). There is thus no basis to assume that Congress silently incorporated the government's regulations and guidance glossing the statute as it stood *before* Congress rewrote

6

it.  Moreover, the regulation the government invokes (Opp. 10-11), 26 C.F.R. § 301.7508A-1(b), addresses only how the IRS wields its *discretion* to disregard disaster periods under Section 7508A(a).  The amendment superimposed a statutory *command* in Section 7508A(d) that the full disaster period (plus 60 days) must be disregarded.  Congress cannot be said to have ratified an agency's approach to granting discretionary relief by amending the statute to *mandate* that relief.

> **C.      The Government's Policy Arguments Are Misdirected**

In the end, the government retreats to a policy concern:  that suspending interest accumulation on a tax deadline "unaffected by the disaster" would give taxpayers "a windfall  * * *  for dilatoriness."  Opp. 12-13.  That policy argument is aimed at the wrong audience.  "[P]olicy arguments  * * *  cannot supersede the clear statutory text."  *United States ex rel. Schutte* v. *SuperValu Inc.*, 598 U.S. 739, 758 (2023) (internal quotation marks omitted).  Because "the [Internal Revenue] Code's plain text permits the taxpayers here to receive these benefits," this Court "need not address" supposed "policy concern[s]," such as whether a tax provision gives taxpayers a "windfall."  *Gitlitz* v. *Commissioner*, 531 U.S. 206, 220 (2001).  This Court should simply apply the statute as written.  Any supposed "windfall" is a consequence of Congress's policy judgment in enacting Section 7508A(d).

The government's policy argument, moreover, rests on a supposed distinction its own rationale cannot support.  The continued accrual of interest on a tax obligation is a consequence of an ongoing failure to meet a daily recurring deadline to pay taxes owed.  Congress's judgment that a disaster (such as the COVID-19 pandemic) makes paying a tax liability sufficiently difficult to warrant suspending interest accrual turns on the taxpayer's situation when the disaster strikes, not on whether the taxpayer might have paid at some earlier point.  That judgment applies with equal force to the original payment deadline and to the recurring, evergreen deadline to pay a liability that is already overdue.  That a taxpayer whose liability predated the disaster could have paid

before the disaster began is beside the point.  Once the disaster strikes, that taxpayer faces the same difficulty as one whose liability comes due during the disaster.  If suspending interest is a windfall for the one, it is equally a windfall for the other.  And, ultimately, Congress made the policy judgment to suspend accrual of interest during a presidentially declared disaster, drawing no distinction based on when a tax first came due.  Its decision to grant that relief categorically is controlling.

The government's policy concerns are especially inapt in the particular context of this case.  Western Digital's tax liability was not fixed until well after the presidentially declared disaster period had begun.  That liability arose from a drastically inflated asserted deficiency that the government ultimately settled for roughly a dime on the dollar.  See Mot. 2 (asserted deficiency of $513,231,527 settled for $53,635,842).  The amount of interest owed by Western Digital was not even determinable until February 2023, in the midst of the COVID-19 disaster period.  There is no meaningful distinction between a disputed tax liability that became fixed during the disaster and one that first comes due during the disaster in the ordinary course.

That leaves only the government's fallback suggestion (Opp. 13-14) that Section 7508A cannot provide "generalized tolling," which (it asserts) would harm taxpayers by extending the *government's* deadlines to take certain actions.  That suggestion is both insincere and irrelevant.  If the government's concern that the natural meaning of Section 7508A(d) would forgive *its own* failures to meet deadlines were genuine, the government could resolve that concern unilaterally by simply choosing not to invoke Section 7508A(d) to excuse its own untimeliness.

In any event, it was perfectly sensible for Congress to strike the balance of offering relief to taxpayers and the government alike in Section 7508A(d).  That evenhanded approach to extending deadlines for specified acts recognizes that disasters can impede *any* party's performance of its tax-related obligations.  The COVID-19 disaster at issue illustrates that effect:  The "IRS had

8

to temporarily shut down its onsite operations, including its mail processing facilities" and "tax enforcement programs." *How the Pandemic is Changing the IRS*, U.S. Government Accountability Office (Nov. 2, 2021), https://perma.cc/7SHX-FLW3.　Of course, Congress could have departed from that evenhanded treatment if it wished.　Indeed, it enacted express statutory carveouts from disaster relief for the determination of at least one interest-related determination: "the amount of interest on any overpayment of tax."　26 U.S.C. § 7508(b)(1); see also 26 U.S.C. § 7508A(c) (2019) (applying Section 7508(b) to Section 7508A); 26 U.S.C. § 7508A(d) (same).　That Congress chose not to give either side special treatment in Section 7508A(d) reflects its deliberate policy judgment.

## II.　There Is No Lawful Basis To Limit Western Digital's Refund To 60 Days Or 1 Year

The government fares no better in attempting (Opp. 14-24) to truncate the relief period under Section 7508A(d) to 60 days or 1 year.　The statutory text unambiguously forecloses those efforts: The period to be disregarded "begin[s] on the earliest incident date specified" in the President's Stafford Act declaration and "end[s] on the date which is 60 days after the latest incident date so specified."　26 U.S.C. § 7508A(d)(1) (2019).　Here, the President's March 22, 2020, Stafford Act declaration made California a "disaster area" under Section 7508A(d), "beginning on January 20, 2020, *and continuing*."　85 Fed. Reg. 20,703, 20,703 (Apr. 14, 2020) (emphasis added).　The declaration was later amended to "close" the "incident period　* * *　effective May 11, 2023."　88 Fed. Reg. 8884, 8884 (Feb. 10, 2023).　Thus, Section 7508A(d) suspended accrual of any interest between January 20, 2020, and July 10, 2023—60 days after May 11, 2023, the latest date specified in the disaster declaration, as amended.　The government's contrary views lack merit.

**A.    The Declaration's "And Continuing" Language Forecloses The Government's Attempt To Limit The Suspension Period To 60 Days**

The government first argues (Opp. 14-17) that "the declaration" itself did not "specif[y]" an end date and thus limits tax relief to only 60 days from the *initial* date specified in the declaration. That is an incorrect reading of the statute and, with respect to the President's declaration, absurd.

1.    The President's declaration expressly specified that the disaster was "continuing" and thus simply postponed determination of when the disaster would end. 85 Fed. Reg. at 20,703. That makes perfect sense: Often a President seeking to unlock urgently needed emergency authorities amid a national crisis will invoke the Stafford Act with no ability to predict *when* the disaster will end. Declaring a "continuing" disaster simply requires the Executive itself to determine later when the disaster has ended.

Any ordinary speaker of English would understand this commonsense point. If you and a neighbor agree to check each other's porches for packages while the other is away, and your neighbor tells you he unexpectedly needs to travel for a family emergency that is "continuing," you would keep checking until he returns. You would *not* conclude that the neighbor's failure to *state* up front his specific return date—which he may not yet know because the emergency's duration is unpredictable—relieves you of any duty to check for packages after the first day.

The same straightforward conclusion follows here. In March 2020, with no end to the COVID-19 crisis in sight, the President declared a "continuing" disaster and expressly authorized the Federal Emergency Management Agency (FEMA) to "allocate  * * *  funds" as "necessary for Federal disaster assistance" and "to make changes to this declaration for the approved assistance." 85 Fed. Reg. at 20,703. When FEMA later declared the disaster period over, it amended *the same* state-specific Stafford Act declaration—"this declaration." *Ibid.* The amended declaration is a continuation of "the same, single declaration," Opp. 17—not a separate one. The declaration itself

10

thus "specified" the latest incident date (26 U.S.C. § 7508A(d)(1)(B) (2019)):  The original declaration specified that the end date would be provided later, and the amended declaration supplied a date.

2.      The government offers a smattering of counterarguments, but none holds water.

The government dismisses (Opp. 15) "what the declaration 'intended' with respect to the disaster's duration" and insists that "*Congress* intended" for a declaration of a "'continuing'" disaster that does not set a *fixed* end date up front to proclaim only a one-day emergency.  But nothing in Section 7508A(d)'s text plausibly mandates the wooden, Simon-Says rule the government tries to lay at Congress's feet, which treats a disaster of unknown duration, expressly declared to be "continuing," as lasting just one day.  The government itself ultimately disclaims that untenable interpretation and recasts its position as giving every disaster declaration without a fixed end date a 60-day duration by default.  *Ibid.*  But that sleight of hand fails in its attempt to obscure the implausibility of the government's position.  All agree that the version of Section 7508A(d) in effect at the relevant times expressly mandated that the period to be disregarded extend 60 days *beyond* the end of the disaster.  26 U.S.C. § 7508A(d)(1)(B) (2019) (period to "be disregarded" shall "en[d] on the date which is 60 days after the latest incident date so specified").  The government's contention (Opp. 15) that the period to be disregarded here "end[ed] 60 days" after the start date specified in the original declaration (January 20, 2020) thus unavoidably means treating the COVID-19 major disaster the President declared as ending within 24 hours.

The government similarly writes off as "irrelevant" (Opp. 15) the original declaration's explicit "and continuing" language, but its response makes no sense.  The government concedes (Opp. 16) that a declaration stating a disaster's start date and describing it as "'continuing' was not novel" when the relevant version of Section 7508A(d) was enacted.  And it observes that, "[a]s a

11

rule  * * * , 'Stafford Act declarations do not expire.'" *Ibid.* (citation omitted).  But it offers no sound reason to infer that Congress meant to nullify that existing practice or prohibit the President from declaring a major-disaster period's start date in the initial declaration and then amending the declaration to specify an end date once it is determined.  Its own example—Hurricane Katrina— proves the point:  The "major disaster" the President declared was originally specified as "begin- ning on August 29, 2005, and continuing."  70 Fed. Reg. 53,803 (Sept. 12, 2005).  But that decla- ration was later "amend[ed]" by FEMA to provide that "the incident period for th[at] disaster is closed effective November 1, 2005."  70 Fed. Reg. 70,086 (Nov. 21, 2005).  The COVID-19 dec- laration and amendment here followed that same familiar, sensible approach.  Yet on the govern- ment's current view, Congress silently *repudiated* established Executive Branch practice.

The government next contends that a straightforward reading of Section 7508A(d)'s text could indefinitely suspend "interest accrual on tax debts *for all taxpayers everywhere*."  Opp. 19. But Section 7508A(d) affords relief only to qualified taxpayers in federal disaster areas specifically declared by the President.  COVID-19 happened to be a nationwide (indeed, global) emergency, and the President accordingly issued declarations covering California and every other State.  Mot. 3-4.  The nationwide scope of relief to taxpayers resulted from the nature of that unique national disaster and the President's responses to it—not any "elephants" (Opp. 19) hiding in the statute.

The government also professes concern that reading Section 7508A(d) as written "gives FEMA administrators greater power over tax administration than the IRS and the Treasury Secre- tary."  Opp. 19.  That asserted fear is disingenuous.  As the government well knows (and often stresses), "[u]nder our Constitution, the 'executive Power'—all of it—is 'vested in [the] Presi- dent.'"  *Seila Law LLC* v. *CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1); see, *e.g.*, Gov't Br. at 2, *Trump* v. *Slaughter*, No. 25-332 (U.S. argued Dec. 5, 2025).  FEMA and

12

Treasury alike answer to him. And here the President expressly granted FEMA authority to amend the declaration, 85 Fed. Reg. at 20,703—authority FEMA exercised when it closed the disaster period in 2023. (And if FEMA's action ending the disaster period were ineffective, the period would *still* be ongoing.) There is thus simply nothing to the government's suggestion that giving effect to FEMA's determination of the end date of the disaster period declared by the President would somehow *subvert* the Executive's prerogatives. Respect for the separation of powers counsels against courts superintending how the Executive Branch allocates authority and responsibility among its agencies.

The government asserts (Opp. 18) that Congress could not have intended to permit the mandatory period under Section 7508A(d) to exceed the discretionary period under Section 7508A(a). But as Western Digital has shown (Mot. 15-16), what the government casts as an unintended anomaly is in fact a consequence Congress expressly anticipated in the statutory text. Recognizing the potential for overlap, Congress provided in Section 7508A(d)(5) that the mandatory period in (d)(1) is "in addition to" or "concurrent with" the discretionary period under (a). 26 U.S.C. § 7508A(d)(5) (2019). Treasury itself acknowledged the same possibility in its regulations. Mot. 16 (quoting 26 C.F.R. § 301.7508A-1(g)(3)). The statute sensibly reflects a mandatory relief period set by Congress—keyed to dates based on facts found by the Executive Branch—and potentially supplemented by an additional (perhaps shorter) period in the IRS's discretion. The government offers no response.

To be sure, Congress might not have foreseen the particular facts that led the COVID-19 disaster period to exceed a single year, but that is irrelevant. "[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998). And in any event Congress has

13

spoken to this very issue:  In 2021, it confronted the issue of "continuing" Stafford Act disaster declarations—in the midst of the COVID-19 pandemic—but chose to amend the statute to provide for a flat 60-day period of tax relief *only prospectively*, for "federally declared disasters declared after the date of enactment of this Act."  Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 80501(b), 135 Stat. 1335 (2021).

The government refuses to heed Congress's judgment to make the 2021 amendment applicable only prospectively.  It suggests (Opp. 20) that the amendment's real effect was to change only "the start" of the period (to the later of the earliest incident date *or* the date of the disaster declaration).  But again the statutory text as amended says the opposite.  Congress amended Section 7508A(d)(1)(*B*), which specifies the "*en*[*d*]" of the disaster period to be disregarded—not Section 7508A(d)(1)(*A*), which specifies the "*beginning*" of that period.  26 U.S.C. § 7508A(d)(1) (2019) (emphases added); see Pub. L. No. 117-58, § 80501(a), 135 Stat. 1335.  By deleting any reference to the latest incident date in the "ending  * * *  date" provision, 26 U.S.C. § 7508A(d)(1)(B) (2019), the 2021 amendment created a mandatory 60-day regime that does not depend on the disaster's duration.  With COVID-19 as the backdrop, Congress's amendment should have the most bite in the case of declarations of continuing disasters—not the least.  The government cites nothing to support its farfetched view that Congress's real concern involved ensuring that "the 60-day postponement period under § 7508A(d) does not end before the declaration itself is issued."  Opp. 20.

Finally, the government insists (Opp. 21-22) that Congress's 2021 amendment merely "made explicit what was implicit in the prior version."  That cannot be right.  Congress would not have made the amendment effective only *prospectively* if the amendment were simply stating what the statute had *always* required.  The government spends pages distilling from *Bufkin* v. *Collins*,

14

604 U.S. 369 (2025), the basic point that a later statute *can* merely "mak[e] explicit" what was "previously implicit," *id.* at 380.  But the government cannot explain how a statutory amendment that by its terms applies only prospectively could declare a proposition that has *always* been true.  A statute could recognize that the Earth has always been round, but it would be incoherent for a statute to declare that the Earth has always been round *starting tomorrow*.  The government's clarification theory, in short, is meritless.  It should thus come as no surprise that the government has been willing to settle cases stipulating that "interest will not be assessed for" a disaster period *longer* than 60 days.  See *Mayronne* v. *Commissioner*, No. 1984-24 (T.C. Mar. 13, 2026).

### B.    The Statute Does Not Limit Disaster Periods To One Year

Falling back, the government halfheartedly suggests (Opp. 22-24) that Section 7508A(d)'s "in the same manner" directive implicitly subjects subsection (d)'s statutorily defined period to the one-year limit under subsection (a).  That limitation is equally contrived and unsupportable.

Nothing supports a one-year limitation on Section 7508A(d)'s scope.  The "manner" of disregarding a period describes *how* the period should be disregarded, not the *length* of the period to be disregarded.  See *Kwong* v. *United States*, 179 Fed. Cl. 382, 387-88 (2025) ("the 'manner' in which the period is disregarded  * * *  is more evidently not the length of time but the types of actions that can be delayed"); Mot. 14-17.  And given Congress's detailed instructions for calculating the beginning and end of the mandatory period to be disregarded, it is implausible that Congress obliquely imposed an unstated, one-year limit.  Courts "generally do not read limitations into statutes that do not appear in their text," and there is "no basis for doing so here."  *M & K Employee Solutions, LLC* v. *Trustees of IAM National Pension Fund*, 146 S. Ct. 1224, 1231 (2026).

### C.    This Court Should Not Stay The Case Pending A Possible Decision In *Kwong*

The Court should reject the government's alternative request (Opp. 24-25) to "sta[y] this case pending the Federal Circuit's disposition of the *Kwong* appeal," where the government may

15

challenge *Kwong*'s rejection of the government's arguments for limiting the Section 7508A(d) period to either 60 days or one year.  Such a stay is the sparse exception, not the rule.  "Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both."  *Landis* v. *North American Co.*, 299 U.S. 248, 255 (1936).  If "there is even a fair possibility that the stay  * * *  will work damage to some one else," the stay applicant "must make out a clear case of hardship or inequity in being required to go forward."  *Ibid.*; see *Cherokee Nation of Oklahoma v. United States*, 124 F.3d 1413, 1418 (Fed. Cir. 1997) (applying *Landis*).

This case presents no such "rare circumstances."  *Landis*, 299 U.S. at 255.  A stay would prejudice Western Digital because it has "a compelling interest in proceeding with [its] suit without delay" and receiving a prompt refund.  *Cherokee Nation of Oklahoma*, 124 F.3d at 1418.  And because the government is the appellant in *Kwong*, a stay would unfairly put Western Digital "at the mercy of the party against whom [it] seek[s] redress."  *Ibid.*  The government, by contrast, has not even attempted to demonstrate any "hardship or inequity in being required to go forward."  *Landis*, 299 U.S. at 255.

Instead, the government generically asserts (Opp. 25) that staying the case would serve "judicial efficiency."  That is not the sort of "pressing need" required for a stay.  *Cherokee Nation of Oklahoma*, 124 F.3d at 1416; *Landis*, 299 U.S. at 255.  And the government's assertion is wrong in any event.  The government's appeal in *Kwong* was only recently docketed, so a decision in that case is far off.  See Doc. 1, *Kwong* v. *United States*, No. 26-1843 (Fed. Cir. May 20, 2026).  It is not yet even clear whether the government will prosecute that appeal or has authorization to do so.  Cf.  28 C.F.R.  0.20(b);  U.S. Department of Justice, *Justice Manual* § 2-2.121 (2018), https://perma.cc/VK7S-FPAM.  And even if the government pursues the appeal of *Kwong*'s hold-

16

ing on the duration of the period Section 7508A(d) requires to be disregarded, the Federal Circuit's eventual decision would have no bearing on Western Digital's entitlement to a refund here; at most, it might affect the amount. The government identifies nothing to justify its requested stay "of indefinite duration." *Landis*, 299 U.S. at 255.

Even if a stay would spare this Court's resources in the short term in this particular case, moreover, it would disserve the judicial system as a whole. The Federal Circuit has recognized that trial courts have a "paramount obligation to exercise jurisdiction timely in cases properly before" them. *Cherokee Nation of Oklahoma*, 124 F.3d at 1416. And the Federal Circuit has underscored that it benefits from "allow[ing]" an "issue to percolate in the district courts so as to more clearly define the importance, scope, and nature of the issue for us to review." *In re Google LLC*, 2018 WL 5536478, at *3 (Fed. Cir. Oct. 29, 2018); see *Mudge* v. *United States*, 308 F.3d 1220, 1225 (Fed. Cir. 2002) ("our decision today benefits from the analysis of five other opinions in which the Court of Federal Claims has addressed precisely this issue"). If the court of appeals must ultimately decide *Kwong*, it would benefit from this Court's analysis of Section 7508A.

## CONCLUSION

This Court should grant summary judgment to Western Digital in the amount of approximately $20,764,747, or such amount as the Court determines to be refundable, plus statutory interest on that amount as provided by law.

17

Date: June 22, 2026

Respectfully submitted,

*/s/* Saul Mezei

Saul Mezei
Jonathan C. Bond
John F. Craig, III
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539
SMezei@gibsondunn.com
JBond@gibsondunn.com
JCraig@gibsondunn.com

*Attorneys for Plaintiff*

18